Loiung, J.,
dissenting:
I dissent from the conclusions of the majority of the court in this case.
The petitioners claim the difference in value between the notes paid to them at the treasury and their amount “ in lawful money of the coin of the United States,” and I think that, on the facts shown, they are entitled to it.
It was contended for the petitioners that the statute of February 25, 1862, was unconstitutional, and this requires us to consider the power of Congress to make money, i. e., the legal money of the .country, and that which constitutes a legal tender for debts. This is the sense in which the statute uses the word “money,” in its phrase “ lawful money, and a legal tender in payment of all debts, public and private, within the United States,” &c. This distinguishes clearly between money and currency, and I shall use the word money as the statute uses it, and with the distinction it makes.
Under the eighth section of the first article of the Constitution the powers of Congress are of two distinct kinds : First, the enumerated or specified powers. Secondly, the incidental powers under the 18th specification, which follows the enumerated powers, and is thus expressed : “ To make all laws and regulations which shall be necessary and proper for carrying into execution the foregoing powers,” &c. This is by its terms applied to each of the enumerated powers, and is of each only the proper complement furnishing the means of its execution. It would have been implied if not expressed, and therefore it does not in any way extend any enumerated power, and it is immaterial to its construction.
The fifth specification of the enumerated powers is as follows :
“ To coin money, regulate the value thereof and of foreign coin, and fix the standard of weights and measures.”
It is clear that this power “ to coin money ” is in terms a power to make money of coin, and is not in terms a power to make money of paper, and therefore, that the power to make money of paper is omitted in the only provision of the Constitution that expressly confers *574 on. Congress any power to make money at all. And the history of the country anterior .to the Constitution, and the experience of its framers in all public affairs, as well as the records of their proceedings, make it certain that this omission of any express power to make money of paper was not from accident or oversight, but was a well-considered and matured purpose. And if it was, I think the necessary conclusion is that the framers of the Constitution purposely withheld from Congress the power to make money of paper; and I think they so fashioned its grant of power as to effect that purpose.
Every grant of a specified power is a limitation of that power, in the same way and for the same reason that a grant of an estate, in the accurate language of the common law, is a limitation of that estate, because it is all that the deed contains, and all that can be claimed under it. And, from the nature of powers, every limitation of a power is a prohibition to transcend it, because if it had not that effect it would have none, and would not be a limitation. The natural language of every limited power is, “ Thus far shalt thou go, and no farther.” And every limited power necessarily covers and disposes of the whole subject to which it relates, for it confers authority to its extent, that is, up to the line it draws, and excludes authority from all beyond it, because both of these effects are involved in its limiting effect.
Then the Constitution is a unit, and its articles and sections constitute one instrument, and, like a statute, it is to be so construed as to be consistent with itself, and each part with all the rest. Therefore what is expressly prohibited in one part of the instrument cannot be implied from any other part. And what is expressly limited in one part cannot be implied without the limitation from any other part of the instrument. Thus, for instance, Congress is expressly prohibited from laying duties on exports, and therefore, though duties pertain to commerce and export duties would supply revenue, yet a power to lay duties on exports cannot be implied from the power to regulate commerce, or to lay and collect taxes, or to borrow money, because such a construction would defeat the express prohibition. So Congress is empowered to lay duties on imports, but it is expressly provided that such -duties “ shall be uniform throughout the United States,” and this is an express limitation of the power; and there cannot be implied from the power to regulate commerce, See,., a power in Congress to lay duties on imports not uniform throughout the United States, because such a construction would defeat the express limitation. And for the like reason I think the power to make money of paper cannot he im *575 plied from the power to regulate commerce, or to lay and collect taxes, or to borrow money, because sueb a construction would defeat tbe limitation implied'in tbe words “ to coin money.”
That tbe limitation referred to u implied in tbe words “ to com money” is, I think, as clear and certain as their meaning. The distinctive meaning of the>’ words “ to coin” is, necessarily, to make coin, as distinguished from other things, and then to coin money is to make coin money, which, as no purpose is specified or excepted, is to be money absolutely and for all purposes, and thereby, a standard of value, and a legal tender in the payment of debts and the discharge of contracts.
And in construing the powers of Congress an implied is equivalent to an express limitation, .and that is equivalent to an express prohibition ; because, as I have said, a limited power necessarily covers and disposes of the whole subject to which it relates. And if that is admitted which never was denied — namely, first, that the power of Congress under the 5th specification, “ to coin money,” is a limited power; secondly, that the Constitution is one instrument, and must be so construed as to be consistent with itself, and each part with all the rest — then I think it is a logical consequence that by the 5th specification, “ to coin money,” Congress is positively excluded from any further power of making money at all.
Under the power to regulate commerce, Congress, it is said, may pass laws to regulate the currency of the country, of which money is apart; but that right must be'exercised subject to the limitations expressed or implied in the Constitution. And the right to regulate the existing and lawful currency of the country is not the right to make paper money a legal tender. And those who have most strenuously asserted that Congress, under its power to regulate commerce, &c., had the one, have most emphatically denied that it had the other. Thus Mr. Webster, whose authority on the construction of the Constitution may lend support to a legal judgment, while maintaining that it was not only the right but the imperative duty of Congress, “having the power to regulate commerce, and the power over the coinage,” to regulate ,the currency of the country, in his speech on the specie circular said : “ But what is meant by ‘ the constitutional currency,’ about which so much is said ? What species or forms of currency does the Constitution allow, and what does it forbid 1 It is plain enough that this depends on what we understand by currency. Currency, in a large, and perhaps a just sense, includes not only gold and silver and bank notes, but bills of exchange also. *576 It may include all that adjusts exchanges and settles balances in the operations of trade and business. But if we understand by currency the legal money of the country, and that which constitutes a lawful tender for debts, and is the statute measure of value, then undoubtedly nothing is included but gold and silver. Most unquestionably there is no legal tender and there can be no legal tender in this country, under the authority of this government or any other, but gold and silver, either the coinage of our own mints, or foreign coins at rates regulated by Congress. This is a constitutional principle, perfectly plain, and of the very highest importance. The States are expressly prohibited .from making anything but gold and silver a tender in payment of debts ; and although no such express prohibition is applied to Congress, yet as Congress has no power granted to it in this respect but to coin money and to regulate the value of foreign coins, it clearly has no power to substitute paper or anything else for coins as a tender in- payment of debts and in discharge of contracts. Congress has exercised this power fully in both its branches. It has coined money, and still coins it; it has regulated the value of foreign coins, and still regulates their value. The legal tender, therefore, the constitutional standard of value, is established and cannot be overthrown. To overthrow it would shake the whole system.
“ But if the Constitution knows only gold and silver as a legal tender, does it follow that the Constitution cannot tolerate the voluntary circulation of bank notes convertible into gold and silver at the will of the holder as part of the actual money of the country 1 Is a man not only to bo entitled to demand gold and silver for every debt, hut is he, or should he be, obliged to demand it in all cases 1 Is it, or should the government make it, unlawful to receive pay in anything else ? Such a notion is too absurd to be seriously treated. The constitutional tender is the thing to be preserved, and it ought to be preserved sacredly under all circumstances. The rest remains for judicious legislation by those who have competent authority.
“ I have already said that Congress has never supposed itself authorized to make anything but coin a tender in the payment of debts between individual and individual, but it by no means follows from this that it may not authorize the receipt of anything but coin in payment of debts due, to the United States. These powers are distinct and flow from different sources. The power of coinage is a general power, a portion of sovereignty taken from the States and conferred on Congress for the sake of uniformity and of greater security. It is *577 to be exercised for the benefit of all the people by establishing a legal tender and standard of value in all transactions.
“ But when Congress lays duties and taxes, or disposes of the public lands, it may direct payment to be made in whatever medium it pleases. The authority to lay taxes includes the power of deciding how they shall be paid ; and the power granted by the Constitution to dispose of the territory belonging to the United States carries with it, of course, the power of fixing not only the price and the conditions and the time of payment, but also the medium of payment. Both in respect to duties and taxes and payment for lands, it has been accordingly the constant practice of Congress in its discretion to provide for the receipt of sundry things besides gold and silver. As early as 1797 the public stocks of the government were made receivable for lands sold, the six-per-cents at par, and other descriptions of stock in proportion. This policy had probably a double purpose in view, the one to sustain the price of the public stocks, and the other to hasten the sale and settlement of the lands. Other statutes have given the like receivable character to Mississippi stock and to Virginia land scrip. So treasury notes were made receivable for duties and taxes; and, indeed, if any such should now be found outstanding, I believe they constitute a lawful mode of payment at the present moment, whether for duties and taxes or for lands.”
And in the same speech he said : “Mr. President, the subject of the currency is so important, so delicate, and in my judgment surrounded at the present moment with so much both of difficulty and of danger, that I am desirous, before making the few observations which I intend on the existing condition of things and its causes, to preclude all misapprehension by a general statement of my opinions respecting that subject.
“ I am certainly of opinion, then, that gold and silver at rates fixed by Congress constitute the legal standard of value in this country, and that neither Congress nor any State has authority to establish any other standard, or to displace this. But I am also of opinion that an exclusive circulation of gold and silver is a thing absolutely imprac-; ticable, and, if practicable, not at all to be desired, inasmuch as its effect would be to abolish credit, to repress the enterprise and diminish the earnings of the industrious classes, and to produce, faster and sooner than anything else in this country can produce, a moneyed aristocracy.”
I hare cited this particular speech because it brings together, and considers in reference to each other, the power of Congress over the *578 currency under the powers to regulate commerce, &c., and the limit of its power as to a legal tender under the clause “ to coin money,” &c., and deduces its conclusions from all; and because it shows the difference between that which may be used as currency and that which alone is a legal tender; and how and why the United States may, as well as individuals, accept, as payment of debts due to themselves, United States stocks, or State stocks, or land scrip, or treasury notes, or United States bank notes, or State bank notes, or that which is currency, though not a legal tender; and because it is an authoritative declaration that up to its date, December 21, 1836, Congress had never supposed itself authorized to use a power which I believe they have never used, except in the statute in question here, viz : the power “ to make anything but coin a legal tender in payment of debts between individual and individual.” And I have cited the authority of Mr. Webster because no one in or up to his day carried further than he did the powers of Congress under the provisions to regulate commerce, &c., to borrow money, &c., to lay and collect taxes, &c. He was of counsel in the case of McCulloch v. The United States, (4 Wheaton, 316,) and his argument claimed all that the court adjudged.
There were cited at the bar the general propositions used in that case by the court, in arguing that Congress, in carrying into execution its enumerated powers, might use, as incidental to those, other non-enumerated powers. But I think all that was declared in that case pertinent to this was that Congress could not use one enumerated power as incidental to or implied from another enumerated power. The question in that case was, whether Congress might create a corporation, i. e., an incorporated bank, under its enumerated powers to regulate commerce, borrow money, &c. And it was decided that it could, because the power to create a corporation was not an independent enumerated power. Chief Justice Marshall said, in the voice of the court, as follows : “ The power of creating a corporation, though appertaining to sovereignty, is not, like the power of making war or levying taxes or of regulating commerce, a great substantive and independent power, which cannot be implied as incidental toother powers, or used as a means of executing them.” (4 Wheaton, 411, McCulloch v. The State of Maryland.)
Now, the power to make money is a great substantive and independent power, and is so used in its specification in the Constitution, where it is classed and enumerated with those powers which the Chief Justice mentions as examples; and, therefore, on the authority *579 of McCulloch v. The State of Maryland, the power to make money cannot be implied as. incidental to, or nsed as a means of carrying into execution, the power to regulate commerce, or any other enumerated power.
It is to be remembered that the enumeration of powers is essential to the scheme of our government, for by that it is made a government of specified powers. And if Congress may imply the power to make money of anything but coin from its power to regulate commerce, and on the ground that it will further commerce, so it may imply any and every other enumerated power that it may think or say would further commerce. It may imply the power to lay duties on imports which at its pleasure may or may not be uniform throughout the United Stares, because duties are essential to commerce; the power to borrow money on the credit of the United States, because money is needed to build breakwaters, custom-houses, and bonded warehouses, &c., which are the requirements of commerce; the power to establish laws on the subject of bankruptcies which at its pleasure may or may not be uniform, because bankrupt laws are useful and expedient in a commercial community; the power to punish counterfeiting the securities and current coin of the United States, because these offences are detrimental to commerce; the power to establish post offices and post roads, because mail facilities are essential to commerce; the power to promote the progress of science and the useful arts, because these multiply the subjects, develop the resources, and improve the means of commerce; the power to constitute tribunals as courts of admiralty and maritime jurisdiction; which may be at its pleasure inferior or not inferior to the Supreme Court, because courts of admiralty and maritime jurisdiction are essential to commerce; the power to punish piracies and felonies on the high seas, because these crimes are directly injurious to commerce; the power to declare war, grant letters of marque and reprisal, because these may be necessary to repel or redress encroachments on commerce ; the power to raise and support armies by appropriations at its pleasure for any longer term than two years, because armies and armed posts are necessary to protect the commerce of our extended frontier on civilized countries and Indian tribes; the power to provide and maintain a navy, because a navy is essential to the protection of our foreign commerce; the power to make rules for the government and regulation of the land and naval forces, because, if armies and navies are useful for the protection of commerce, rules for the government and regulation of the army and navy are essential to them. And so on through the whole cata- *580 logue of enumerated powers, and all others, for there is no subject that commerce, in the large and adjudicated sense of the word, viz., “ intercourse,” may not comprehend. And thus, if Congress may imply one enumerated power, as incidental to another, it may imply all, and this would convert our government of specified powers into a government of universal power vested in the legislature. In the words of Mr. Jefferson, cited by Justice Story, it would “ render all the preceding and subsequent enumerations of power' completely useless. It would reduce the whole instrument to a single phrase, that of instituting a Congress with power to do whatever would be for the good of the United States, and, as they would be the sole judges of the good or evil, it would be a power to do whatever evil they pleased.” Story on the Constitution, § 926. This is the inevitable effect of holding that one enumerated power may be implied as incidental to another ; and it is the reason of the rule of construction that forbids it.
It was claimed in the very able argument for the defendants that Congress had passed acts declaring that foreign coins should not be a legal tender. But the power to regulate the value of foreign coins is expressly given to Congres, and if they may say at what rate they may be taken, they may say that they may not be taken at all; exactly as, under the power to regulate commerce, Congress may prohibit commerce by laying an embargo. (2 Story on the Constitution, 171-’2 ) So it was contended that Congress had power to adulterate by alloy the coin of the United States. But alloy is necessary to the making of coins, for it is the means by which they are hardened for use. To that extent and for that purpose it must be used, and therefore is incident to the power *• to coin money,” and may be implied from it. And beyond that it cannot be implied, for, cessante ratione cessat lex.
On the reasons and authorities stated, I think the power of Congress to make money is, by the words “ to coin money,” limited to making money of coin, and cannot be used without that limitation, and cannot be implied as incidental to any other enumerated power' or used as a means of executing it; and therefore that the act of February 25, 1862, so far as it enacts that the notes described in it “ shall be lawful money and a legal tender in payment of all debts, public and private,” &c., is unconstitutional, and of no effect. If this is so, then the notes paid to the petitioners were payment only so far as they were accepted as such by them. And the evidence shows that this was at their current value, and that the United States had full notice of it by the protest of the petitioners delivered to the *581 Secretary of the Treasury before the payment of the notes was made by him.
And if this is not so, and if the act of February 25, 1862, is constitutional, then, after its enactment, there were two kinds of money, each of which was a legal tender, and efficient for the payment of debts and the discharge of contracts. But they were different things in fact, and I think a contract expressly for the one could not be fulfilled by the payment of the other. Then the evidence shows that the additions, alterations, and modifications, for which the petitioners were to be paid, were made under a clause in the contract providing for such as the United States should require, so that they were work done and materials furnished under the contract and by force of its provisions, and, therefore, subject to its terms as far as they were applicable. Then the contract specified that the original contract price should be paid in lawful money of the coin of the United States, and I think this shows the intent of the parties that all the money payable for work done and materials furnished under the contract, and by force of its provisions, should be so paid, and that such is the effect of the contract on the legal construction of its provisions.
It was contended for the defendants that the petitioners were estopped of their claim by the acceptance of the notes paid to them, and by the statute under which they were paid. The evidence shows they accepted the notes at their current value, and so far the notes were payment, and no further, unless they were a legal tender, and the claim of an estoppel admits they were not. And as to the statute, it states what is not in question here, the sum which Congress had found to be the full amount due the petitioners, and specifies it in dollars and cents, but it does not specify notes or coin, and it'cannot bind the petitioners beyond its terms, if at all. And I think it furnishes no inference that Congress intended, as by a judgment at law, to conclude the petitioners as to any legal rights which might be involved in the medium of payment, or to deprive them of the legal decision of such rights here. I think Congress had no such purpose, because it was not within their functions.
On the whole case, I am of opinion that the petitioners are entitled to judgment for the difference between lawful money of the coin of the United States and the current value of the notes paid to them, and at which they accepted them; and this difference is shown to have been, on the 9th of March, 1863, when the payment was made, forty-three thousand six hundred and thirty-one dollars and twenty-six cents.